The Supreme Court has emphasized that this is such an important right that any government action infringing upon such exercise of that right is strictly scrutinized and is unjustified unless the government makes a showing of an overriding legitimate interest justifying that infringement. Here, the district court failed to strictly scrutinize the defendant's actions with regard to Dr. Hudson, and the defendants failed to establish overriding legitimate interest justifying their infringing on her fundamental First Amendment right. Instead, the district court applied the Pickering-Valentin test, which we submit is inappropriate here, for the paramount and important right of First Amendment freedom of association. Could you clarify one thing for me, and that is, does this case involve what might be characterized as a hybrid speech and associational claim? Well, Your Honor, I guess my position on that is that you could look at it, I think it's more classically a freedom of association. That's the classic. I think that's really what it is. To the extent her going to this public event could be characterized as expression in some fashion by going to it, maybe there is that argument. But I think you allow yourself to fall into the slippery slope of analyzing under the Pickering test, and you kind of erode the paramount importance that the First Amendment freedom of association right. And what case or cases do you think most clearly give us a framework for analyzing what you're now characterizing as primarily or almost purely an associational claim? I think the cases that came out of the Civil Rights Movement, Your Honor, and the early Grant case, the Kishian case, those cases, I think, dealt, I think, primarily with requiring government employees, professors, I believe, to give oaths that they were not members of the Communist Party. And the court seemed to analyze that as association. Here they are associating with other people for political events or political organizations. And I think that's what we're trying to do here. Nobody stopped her from going to the WTO, AFL-CIO march, correct? That's right, Your Honor. No one stopped her from doing that. So that wasn't an issue. She could go down there as a professor and talk and protest and march all she wanted, correct? As a professor or as an individual? I'm not sure she went in the role of a professor. She was told to go as an individual. She went as an individual. So the only restriction was she couldn't really make it a quasi-university or college event with her students, correct? Right. She was not allowed to wear any insignia showing that the college was supporting her going to this. She did not have any signs saying that it was a college, that kind of thing. I think it's like a university professor, a political science professor, some students of this professor say, let's go hear a presidential speech, a campaign speech. But the specific association which was restricted, in your view, was with her students and then together engaging in this act? Right. Exactly, Your Honor. I think — I just want to understand. Right. She has the right to associate with whomever she wants to. And here, it was not a prior restraint case. Rather, it was a retaliation case. After she went to this event, associated with other people at the event, she was retaliated against by being terminated. And so we're not saying they restrained her from going, but rather in retaliation for her doing so, they terminated her. The defendants have not shown valid interest for infringing on her right. They give a litany of very amorphous, insubstantial  Your client, as I understand it, was an adjunct professor?  Vis-a-vis the community college, what did that mean? It meant she was on a contractual, term-to-term contract. That's how her relationship existed. At the end of — does that mean at the end of any given term, they could have decided not to renew the contract? I think that's correct, as long as they don't do so in retaliation for exercising her fundamental rights. That is going to be my next question. Could they do so for any reason? Not any reason, no. I mean, if they're doing so because she's black, for example, or because she appeared to engage in First Amendment rights, they cannot do that. At the end of the day, my understanding is that they offered the position she had had and gave, if you will, the position to a professor who had been a tenured professor who wanted to return to the college. Is that right? A little bit imprecise, Your Honor. That individual was not tenured, who allegedly came back. This is Dr. Wambalaba? Correct. Correct, Your Honor. We submit that, as Herr said, there's no direct evidence from Dr. Wambalaba saying he was — wanted to come back. It's all in here. Well, in fact, that's who they hired, right? Yes, that's right, Your Honor. They did hire him, yes. They did hire him back. If the university had made the choice between an adjunct contract professor, such as your client, and Dr. Wambalaba, without all this prior history, would we be here? Yes, Your Honor, because Dr. Wambalaba was just another adjunct who had no tenure. He was just in the same shoes as Dr. Hudson had been. Well, whoever he might be, if the decision were, okay, it's at the end of her contract term, we now have to decide whether to continue with her or hire someone else, and we have this other applicant who we've had some experience with and we like, we're going to hire him. Without the WTO interface, would we be here? No, Your Honor. She did not have a tenured right to this position. No, she didn't. But here the evidence shows that Dr. Craven — I mean, Mr. Craven said his first — the number one reason he chose to not rehire Dr. Hudson or terminate her is because of her going to the WTO with students. So let me ask my question the sort of hard way. I mean, if the decision not to retain your client could be justified by the non-First Amendment implication of hiring someone that they thought better qualified, more qualified, more acceptable, whatever, in other words, a non-First Amendment reason, doesn't the law permit us to focus on that employment decision with disregard for the history with the WTO? Well, Your Honor, the law says that you — if there's any evidence raising question of fact as to motivation, and if the evidence raises the question of fact that the real reason — Well, suppose they had two motivations. One is they didn't much like her going to this rally and what happened at the rally. But the other motivation was they sort of liked Dr. Wambalava. They'd like to get him back. And he's a good guy, and they're happy to have him as an adjunct as opposed to her. Well, Your Honor, I think the case law is that if — as long as a substantial factor in her termination decision was her exercise of First Amendment rights, that's enough for her to get to the trial. And we think there's evidence that that clearly was the case, and that she has enough to get to the trial. If Pickering applies, do you lose? I'm sorry, Your Honor? If Pickering applies, do you lose? No. We win. We win. Then why not? We win. I think your argument is that Pickering doesn't apply, and therefore, we ought to apply scrutiny. Well, Your Honor, I think the Supreme Court has recognized that freedom of association is a — is a paramount right under our Constitution. Therefore, it should not be lightly given away. I think that Pickering has more of a balancing test. Obviously, that's what it is. And even under that test, though, I think that clearly they have not shown overriding harm to their interest by her going to this to justify her termination. I'd better leave the rest of my time for rebuttal, Your Honors. Thank you. Thank you for your argument. Counsel? Your Honors, may it please the Court. My name is Talos Ablins, and I am here on behalf of the defendants in this case who are officials of the Clark Community College. I intend to focus on the two most fundamental reasons that this Court should affirm the dismissal of Hudson's First Amendment claim. First, Hudson's use of her college classroom to organize a field trip to the WTO protest was not protected by the First Amendment. This conduct did not involve a matter of public concern, and it seriously jeopardized the interests of the college in effectively managing its institution. Second, even if the First Amendment did apply to this conduct, the defendants were entitled to qualified immunity. There is no clearly established law in this area, and these defendants were objectively reasonable in deciding not to rehire this part-time temporary professor for Economics 101. Now, yesterday, in San Diego v. Roe, the United States Supreme Court issued a decision that provides powerful support on both of these reasons. With respect to the First Amendment, the San Diego case reaffirms the dispositive and important nature of Connick's public concern test. The public concern requirement is based on a common-sense realization that when the government is acting as an employer, it must be given broad latitude in managing its employees without the fear of intrusive judicial oversight under the auspices of the First Amendment. But Connick also recognizes that, along with this deference to the government as an employer, there's a recognition that the employee does have a First Amendment right to engage in matters of political or social debate, a right to not be retaliated against on matters that involve or that are of concern to the public at large. And that's the threshold requirement here that the plaintiff was unable to overcome. The – in this case, the plaintiff has boxed herself in through a series of admissions. The most – this Court has recognized in the Sabalos case, which is cited by the plaintiff, the Court – this Court has recognized that the most important factor in the public concern test is the content of the expressive activity. This plaintiff has admitted that content had nothing to do with the decision not to rehire her. She admits that it was fine to the college if she went to the WTO protests or if individuals who happened to be students at the college went to the WTO protest. The only objection was to Hudson taking her Clark College students to the WTO protest. So content was not at issue. This is not a case where the government was suppressing her right to associate with like-minded individuals at the WTO rally. It's not a case where the government has infringed her ability to comment on matters of public concern or to criticize the government as an employer. And in the San Diego case, the Supreme Court has reaffirmed that and noted that typically when the public concern test is satisfied, it has been satisfied by employees who have been terminated because of their unique position to know about governmental activities. But I gather her argument is freedom of association with these students. So it's akin to the situation, I think, in which a teacher says, all right, I would like to be an advisor to, say, the College Republican Party and gets fired for that. Don't you think under those circumstances that that is a matter at least of public concern or at least associational concern? Well, that is what her narrow associational concern is. She is asserting a right to associate with her students. But that is a matter of internal pedagogic concern. Now, the extracurricular affairs of a professor who wants to go outside the classroom and associate with students, that may raise a closer question, but that's not this case. You see, I think the difference here is that if we're talking about public concern in a First Amendment context purely, you know, that makes some sense. But the argument here is associational, which differs from a pure speech argument. And I think it would be difficult under your analysis to find any associational right that wouldn't constitute perhaps a matter of public concern, because association by its very nature can be private. Well, no. The case is that association is derivative, obviously, of the First Amendment protection. Right. And it involves the ability to join with others who have a desire to express similar views. And the Connick case discusses the rights of association and speech interchangeably. It talks about that it actually realizes that pickering is rooted in cases that deal with the government's ability to not hire individuals because of their membership in political parties and as well as their interest in speaking out against the government. So the case law, on one hand, we have a lack of authority provided by the plaintiff indicating that this associational interest to deal with the clients of the college is somehow elevated above the speech interests that are addressed under Connick and pickering. And I guess I'm sort of suggesting you're not maybe knocking down a strong, strong person here, because what you say is, well, she had the freedom to associate with any WTO group, and therefore she loses. But her argument is she wants to associate with some students who have those views, which may be a different question. Well, the interest in associating with students is something within the internal realm of the college. I mean, that's... Getting back to my question, then, how does that differ from, let's say, it's a local student's form of union against the WTO on our college campus, extracurricular activity. She wants to be faculty advisor, gets fired for it. How does that differ? This differs from that case. I think the reason it differs is because that's an extracurricular activity. And I'm not familiar with the cases protecting a professor's right to engage in that association. But what I am familiar with cases that hold that, for instance, in the Graham-Bow case, Graham-Bow v. Central Michigan University, the Court held that an instructor's choice of teaching methods does not rise to the level of protected expression. So what we have here is the pedagogic concerns of the college certainly give it some prerogative to regulate the associate, the limited right of association with students. Can I stop you there, because I'm wondering if what you're doing is now, you had argued that Pickering was an appropriate analysis or that the district court was fine. Are you really moving from public interest to the second part of Pickering? And that is whether there's a legitimate interest the college has to put some restrictions. In other words, I think you're mixing, it seems like we're mixing and matching the public interest issue, which she has. I mean, we, I think we would all agree that WTO is a matter of public interest just in the abstract, correct? Yes. So then the question becomes whether her right to association, in other words, wanting to take students to the WTO march as part of the learning experience is a matter of public interest or concern. If we just say for purposes of argument that it is, then aren't we, isn't your argument more appropriately directed to that second part of Pickering in saying, well, it may well be a matter of public concern, but because of the college environment and pedagogical concerns, the college can put reasonable restrictions and that's all they've done. Yes. I think, yeah, I will be moving on to that point. I agree that if you assume that this association within the college curriculum between a professor and a student raises a public concern similar to the other cases involving speech, then we have a related argument under Pickering and that in this case, the college had legitimate concerns that outweighed any such interest that the employee had. And here... Can I just go back? I think one of the difficulties is the one that you've, through your argument, pinpointed, and that is it's difficult really to apply Pickering straight up to this situation because this associational right is different than... ...pure speech. Do you think there's another case that gives us a better framework for doing that? Or do we just modify Pickering? Well, I provided the Court with the Cobb v. Posse case, which is a Second Circuit case, joining a majority of circuits in applying the conic Pickering analysis to associational activity. And I think that provides a good framework. I do think, though, that we have to realize that Pickering and conic are focused on the interest of the public at large. The focus is not on internal matters of employment situations, but really it is an interest in the marketplace of ideas to ensure that public employees who often have the best information about what the government is doing not be restricted in their ability to engage in a free and open debate. And I think that sets this case apart because here we don't really have a free and open debate. We have a matter of association between a professor and the students, which is really more of an internal matter subject to the prerogative of the employer. And my final point is on the issue of qualified immunity. I think if this Court finds that the First Amendment is implicated in this case, it is virtually impossible for the plaintiff to overcome the defense of qualified immunity. In the Brewster case and in Moran v. Senn, this Court held that the qualified, because of the fact-specific balancing under Pickering, the standard of qualified immunity will rarely, if ever, be overcome. And that's under the Pickering analysis. And the recent San Diego case gives further support to this heavy burden of qualified immunity. The boundaries of the public concern test are not well-defined. You need to wrap up your well over your time. Just wrap up in a sentence or two, if you can. Thank you. So given the Supreme Court's recent pronouncement on the lack of well-defined boundaries in that case and in this case, this Court should affirm the dismissal of Hudson's case. Thank you. Thank you for your argument. Mr. Potter, rebuttal. Thank you, Your Honor. Just a very brief point or two. We submit that qualified immunity is not applicable here. There have been decades of law by the Supreme Court and this Court saying that it's improper to retaliate against an employee for exercising their fundamental First Amendment rights of freedom of association and assembly and or speech. Craven even admitted, Defendant Craven admitted, essentially, that had Dr. Hudson been tenured, her terminating her for going to this event with students would be unconstitutional. So we submit that it was objectively not reasonable to do this and a reasonable Your opponent went about a minute and a half over time. So if you'd like to take another minute or so, you go right ahead. Thank you, Your Honor. Also, Your Honor, with regard to the San Diego v. Roe case, that is distinguishable clearly from our case. In that case, the police officer, he was engaging in activity and he brought his employer into that exquisite conduct. He wore a uniform. He engaged in police-assumed activity. And he identified himself as a law enforcement officer in his eBay listing. He sold police uniforms, including his own department's uniform. So the court properly said, your conduct here, you're not just engaging in explicit activity unrelated to work or outside of work. Therefore, you're not you don't fit into the case where public employees are free to engage in speech outside of work unless the government has an overriding interest in stopping that speech. And again, in Roe, because he was not able to fall into that category, his only recourse was to apply the Connick Pickering, and the court clearly said this individual was not engaging in conduct that involved a matter of public concern. Light years different from our case. Here, as the court in Roe said, quoting Connick, if a citizen has a right to a public employee has a right as a citizen to engage in expressive conduct concerning matters of public concern. That's exactly what we have here. Dr. Hudson went to a public event about a public issue, assembling other people about this issue. So clearly, she would fall, if you did analyze this as a Pickering test, she would fall under that test as having shown that she was engaging in expressive conduct on a public, a matter of public concern. Sotomayor, you need to wrap up. Thank you. And, Your Honor, I think this is similar to a case where a political science professor went with some students to a campaign rally outside of work. Clearly, that would not be he should not be terminated for doing so. We say the same thing. Thank you. Thank you. Thank both sides for their argument. They were both quite helpful. The case to this argument would be submitted.
judges: Farris, Hawkins, McKeown